# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2924

_____

Charles Green,

    Plaintiff - Appellee,

  v.

Union Security Insurance
Company,

    Defendant - Appellant.

\* \
\* \
\* \
\* \
\*  Appeal from the United States \
\*  District Court for the Western \
\*  District of Missouri. \
\* \
\* \
\* \
\*

_____

Submitted: May 12, 2011 \
Filed: July 22, 2011

_____

Before RILEY, Chief Judge, SMITH, Circuit Judge, and STROM,[1] District Judge.

_____

STROM, District Judge.

  After defendant-appellant Union Security Insurance Co. ("Union") denied plaintiff-appellee Charles Green's claim for long-term disability benefits ("LTD benefits"), Green filed a complaint against Union pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. The district court granted summary judgment in Green's favor finding Union had abused its

_____

[1] The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

discretion in denying benefits to Green. Union appealed, challenging the district court's summary judgment order. We have jurisdiction pursuant to 28 U.S.C. § 1291. We find the district court improperly determined Union abused its discretion when it ultimately denied Green's LTD-benefits claim.

## I.

In November 2000, when he was thirty-five years old, Green began working as a light industrial warehouse worker for Andersen Distribution, Inc. ("Andersen"). Previously, Green had obtained a GED in 1985 and had worked as a light industrial and warehouse worker for at least eight years. When he started working at Andersen, Green began participating in Andersen's LTD-benefits disability plan, pursuant to Group Policy No. G 4,015,784 ("Policy"), which Union insured. Under the Policy, participants are eligible for LTD benefits if they are "disabled." The Policy, as it pertained to Green, provided a participant is "disabled" if:

- during the first 24 months of a period of disability (including a qualifying period), an injury, or sickness, or pregnancy requires that you be under the regular care and attendance of a doctor, and prevents you from performing at least one of the material duties of your regular occupation;[2] and

- after 24 months of disability, an injury, sickness, or pregnancy prevents you from performing at least one of the material duties of each gainful

---

[2] Hereinafter the "own occupation definition."

occupation[3] for which your education, training, and experience qualifies you.[4]

The Policy gave Union "sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy" and required Green to "furnish whatever items [Union] decide[s] are necessary as proof of loss or to decide [Union's] liability."

On February 20, 2001, Green stopped working at Andersen citing physical pain as preventing him from being able to work. Steven Rettinger, M.D., who was Green's primary care physician, examined Green and noted the cause of Green's pain seemed consistent with fibromyalgia. Despite this diagnosis, Dr. Rettinger anticipated Green would be able to return to work at some point and discussed with Green "how he needs to take control of his own life and call his place of employment so that he can get off disability and back to work."

In November 2001, Green submitted an LTD-benefits claim to Union. In support of his claim, Green attached an Attending Physician Initial Statement of Disability completed by Dr. Rettinger, which stated Green suffered from chronic back pain, neck pain, fibromyalgia, and tremor. According to Dr. Rettinger, Green was unable to perform any physical work and needed a sedentary work position due to these conditions. After conducting its review, Union found Green eligible for LTD benefits under the Policy's own occupation definition and began paying LTD benefits to Green on February 6, 2002.

---

[3] The Policy defines "gainful occupation" as "an occupation in which you could reasonably be expected to earn at least as much as your Schedule Amount." Green's Schedule Amount was $1,306.67 per month (or $7.54 per hour).

[4] Hereinafter the "any occupation definition."

-3-

Soon thereafter, Union began investigating whether Green qualified for LTD benefits under the Policy's any occupation definition. Union requested Green undergo a functional capacity evaluation ("FCE") to be performed by Healthsouth, which took place on February 20 and 21, 2002. The FCE acknowledged Green had several musculoskeletal deficits but ultimately concluded he "demonstrate[d] the ability to perform sedentary work for an eight hour day." The Healthsouth FCE stated Green was capable of "lifting in the sedentary category of work" and could tolerate walking, climbing stairs, bending and twisting at the trunk, reaching overhead, reaching forward, and sitting.

In April 2002, Union sent a letter to Green encouraging him to apply for Social Security Disability Benefits ("SSD benefits"). Green submitted a claim for SSD benefits, but the Social Security Administration ("SSA") initially denied the claim because Green's "condition was not severe enough to keep [him] from working." Also in April 2002, Union referred Green to its Vocational Services department. In an interview with a Vocational Services employee, Green stated his hobbies included fishing and camping, which he still enjoyed even after the onset of his painful condition. Green also stated he could use his home computer and could drive locally. With this information and the Healthsouth FCE in hand, Union requested Allen Parmet, M.D., an occupational medicine specialist, review Green's file. Dr. Parmet diagnosed Green as suffering from fibromyalgia and migraines, but stated Green was "capable of performing sedentary activities." Dr. Parmet also acknowledged the findings of the Healthsouth FCE that Green was capable of working a full-time sedentary job.

In May and July 2002, Green submitted supplemental reports from Dr. Rettinger to Union regarding Green's condition. In assessing Green's work capabilities, Dr. Rettinger wrote that Green could not sit or stand for extended periods and that he was incapable of doing minimal manual labor due to his neck and back

-4-

pain. He also wrote Green was not a candidate for physical therapy. However, Dr. Rettinger continued to recommend vocational rehabilitation for Green.

On August 26, 2002, Union's rehabilitation counselor, Julie Finnegan, conducted a Transferable Skills Analysis ("TSA") with Green to help identify potential occupations into which Green could transition. Finnegan determined Green's medical conditions and work experience qualified him to work in several sedentary jobs. Finnegan believed suitable work could be found locally for Green at his Schedule Amount wage rate ($7.54 per hour). Thereafter, Union engaged an outside consultant, Brenda Umholtz, to conduct a Labor Market Survey ("LMS"). Umholtz identified ten potential employers with positions available at or above Green's Schedule Amount wage rate for which Green was qualified and physically able to perform. Umholtz wrote that positions were "readily available" for which Green was qualified, that Green would not require vocational training to obtain a position paying between $8.00 and $10.00 per hour, and that "[e]mployers appeared very flexible and willing to accommodate someone with [Green's] restrictions."

In February 2003, Union had a psychologist on its staff, Patricia Neubauer, Ph.D., review Green's records. In discussing Green's condition, Dr. Neubauer stated Green's "primary pain disorder relate[s] to both a general medical condition, fibromyalgia and migraines and has psychological factors that impact his pain complaints." Dr. Neubauer suspected Green's chronic pain condition was a psychological issue, but she stated she could not confirm this suspicion for lack of a psychological evaluation of Green to review. Dr. Neubauer and Union requested to have access to a psychological evaluation that Green underwent in connection with his application for SSD benefits, but Green did not provide this information. Union attempted to schedule a psychological evaluation of Green, but the two times the evaluation was scheduled (September 15 and October 22, 2003) Green did not attend, explaining his absence was due to illness.

On February 28, 2003, an SSA administrative law judge ("ALJ") awarded Green SSD benefits, reversing the SSA's initial determination. The ALJ determined Green had been "disabled" within the meaning of the Social Security Act due to "panic disorder/anxiety[,] depression[,] chronic pain syndrome and fibromyalgia." The ALJ based his finding on the opinions of Green's treating physicians.

On October 31, 2003, Union denied Green's application for LTD benefits, citing that Green did not meet the Policy's any occupation definition, and therefore was not disabled. Based on the medical and vocational evidence in Green's file, Union stated Green's physical condition did not prevent him from performing the material duties of each gainful occupation which Green was qualified to perform. Because Green had failed to undergo Union's requested psychological evaluation, Union stated there was no proof of a claim based on a non-physical condition. In support of the denial, Union cited the supplementary reports completed by Dr. Rettinger that indicated Green could potentially hold a sedentary work position and the Healthsouth FCE that concluded Green could perform a sedentary work position for eight hours per day. Union also referenced the TSA and the LMS.

Green administratively appealed Union's decision on July 8, 2004. As part of its review of Green's administrative appeal, Union began requesting additional information in August 2004. On August 30th, Patsy Maikranz, M.D., submitted a report to Union summarizing Green's relevant medical history and concluding Green "appears to have the capacity to do sedentary work that would allow for position change hourly based on the diagnosis of fibromyalgia."

On September 14 and 15, 2004, Union's Investigative Services Unit conducted a two-day video surveillance of Green to observe his daily practices. On the first day, the investigator observed Green leave his house for approximately forty minutes to visit the doctor's office and post office. On the second day, the investigator observed Green leave his house to run errands, which included pumping gas and making two

trips to a cable television provider's retail store, during which he loaded, unloaded, and carried VCR-sized boxes to and from the trunk of his car. After conducting the surveillance, Union presented the video recordings to Dr. Maikranz. Dr. Maikranz noted that Green was observed engaging in activities his treating physicians did not believe he could do, such as "grasping, handling and reaching." Dr. Maikranz concluded that Green's observed activities on September 14th and 15th were consistent with his performance on the Healthsouth FCE and were inconsistent with his treating physicians' restrictions and limitations.

On November 4, 2004, psychologist Mike Jones, Ph.D., a Union employee, submitted a Behavioral Health Services Assessment regarding Green. In the assessment, Dr. Jones stated Green did not have "significant mental health symptoms" and suggested Green "might have another agenda regarding his lack of response to treatment."

Union wrote to Green's attorney to inform of Union's intent to have Green undergo an independent medical evaluation ("IME") with an occupational medicine specialist. An IME was eventually scheduled for January 26, 2005, with Chris Fevurly, M.D. After examining Green, Dr. Fevurly stated there were "no permanent restrictions or limitations" preventing Green from returning to work.

With the new information in hand, Union resubmitted Green's file to Dr. Maikranz to review. On July 11, 2005, Dr. Maikranz issued a report to Union in which she concluded Green "appears to have the physical functional capacity to perform at least sustained sedentary work as long as he has the ability to change positions hourly and do bending, twisting, stooping and overhead work on no more than an occasional basis." Union also obtained a Vocational Services General Assessment from Richard Hubbard, a Union employee, in which Hubbard reviewed the 2002 TSA and LMS studies completed for Green. Hubbard concluded after reviewing Dr. Maikranz's report that Green was physically capable and qualified to

obtain at least three of the positions identified in the 2002 LMS, which were jobs in customer service and private security.

On September 15, 2005, Union denied Green's appeal upholding its prior decision that he did not meet the Policy's any occupation definition of disabled. In making its decision, Union cited the findings of many of the medical professionals who examined Green, the 2002 Healthsouth FCE, the 2004 two-day video surveillance of Green's activities, the 2005 IME performed by Dr. Fevurly, and the various vocational assessments Green had undergone. Union also cited a lack of cooperation by Green and some of his treating physicians, such as the failure of Dr. Rettinger to provide comments on the Healthsouth FCE when requested, the failure of Green's attorney to provide medical records from the SSA's evaluation of Green when requested, and the failure of Green to attend the psychological evaluations Union scheduled in Fall 2003. Upon review, Union concluded "there is no condition that limits Mr. Green from performing at least one of the material duties of each gainful occupation for which his education, training and experience qualifies him."

Green appealed the decision to Union's Disability Claims Appeals Committee ("Appeals Committee"), the final level of administrative review. As an initial step, the Appeals Committee requested Hubbard complete a revised Vocational Service General Assessment. Hubbard submitted the revised assessment to the Appeals Committee on April 28, 2006, in which he stated Green would not be able to perform a private security job, but that he remained capable of performing a customer service position.

In connection with the final appeal, Green submitted several documents to Union. One of these documents was a letter from Dr. Rettinger. In the letter, Dr. Rettinger commented on the 2002 Healthsouth FCE Green underwent, stating that Green's performance on the FCE was consistent with Dr. Rettinger's evaluation of Green, but that this performance did not demonstrate Green could perform a sedentary

job for eight hours per day five days per week. Green also submitted the psychological evaluation conducted by Gerald Vandenberg, Ph.D., in connection with Green's 2002 SSD-benefits application. In summarizing Green's mental state in 2002, Dr. Vandenberg wrote Green "seemed more dependent than depressed or seriously distressed" and "may be showing mild Dysthymic Disorder, but without significant dysfunction.

The Appeals Committee upheld Union's denial of LTD benefits to Green on July 31, 2006. After reviewing the materials on file and the new materials Green submitted, the Appeals Committee determined Green had not met the Policy's any occupation definition of "disabled" and determined Green had "sufficient functional capacity to perform sustained sedentary work activity as long as he is able to change positions hourly." In support of its determination, the Appeals Committee cited the 2002 Healthsouth FCE and the 2004 video surveillance of Green. The Appeals Committee also considered Green's TSA and LMS and determined Green was capable of working as a customer service representative, which is "sedentary in nature and allows for alternating sitting/standing and no lifting over 10 pounds." With the Appeals Committee's final administrative denial, Union closed Green's claim for LTD benefits.

Green initiated this action on March 11, 2008. After granting leave for Green to conduct limited discovery regarding Union's structural conflict of interest, the parties filed cross-motions for summary judgment. The district court denied Union's summary judgment motion and granted Green's summary judgment motion on March 31, 2010, awarding Green $38,381.67 in past due benefits and prejudgment interest. Union timely filed this appeal.

II.

## A.    Legal Standard

Union challenges the district court's determination that Union abused its discretion when it denied Green's LTD-benefits claim under the Policy's any occupation definition for "disabled." Union effectively concedes that Green suffers from fibromyalgia. However, Union argues that this condition has not rendered Green "disabled" under the Policy's any occupation definition, i.e., incapable of performing at least one material duty of each gainful occupation for which Green's education, training, and experience qualifies him.

We review a district court's summary judgment ruling de novo, applying the same standard of review the district court used. *Midgett v. Wash. Group Int'l Long Term Disability Plan*, 561 F.3d 887, 893 (8th Cir. 2009). Where an ERISA plan grants the administrator discretion to determine eligibility for benefits and to interpret the plan's terms, courts must apply a deferential abuse-of-discretion standard of review. *Id.*; *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Because the Policy in this case gave Union discretionary authority to determine a participant's eligibility for benefits and to interpret the Policy, the district court properly determined Union's LTD-benefits decision of Green's claim was subject to an abuse of discretion standard.

In reviewing for an abuse of discretion, the administrator's decision should be reversed "only if it is arbitrary and capricious." *Midgett*, 561 F.3d at 896 (internal quotation marks and citation omitted). The administrator's decision should be affirmed if it is reasonable, meaning it is supported by substantial evidence. *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 875 (8th Cir. 2006). Substantial evidence is more than a scintilla but less than a preponderance. *Midgett*, 561 F.3d at 897. "'The requirement that the plan administrator's decision be reasonable should be read to

mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.'" *Id.* (quoting *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002)) (internal brackets omitted); *see also Groves*, 438 F.3d at 875 (quoting *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002)) (same).

###     B.     Union Did Not Abuse Its Discretion

We find the district court improperly granted summary judgment in Green's favor when it determined Union abused its discretion in denying Green's LTD-benefits claim. Based on the record before Union, there was more than a scintilla of evidence supporting Union's conclusion that Green's condition did not render him "disabled" under the Policy's any occupation definition. Union's decision was supported by substantial evidence, and "a reasonable person *could* have reached a similar decision." *Midgett*, 561 F.3d at 897.

First, the district court improperly discounted the 2002 Healthsouth FCE, which was conducted over a period of two days and concluded Green was capable of working in a full-time sedentary job. The district court assigned "limited value" to the Healthsouth FCE because Green's symptoms were variable, which prevented the FCE from establishing that Green could work "40 hours a week, week after week."

This court has stated an FCE "alone constitutes more than a scintilla of evidence" when the FCE concludes a benefits claimant does not meet an ERISA plan's "disability" definition. *Jackson*, 303 F.3d at 888. The district court improperly evaluated the Healthsouth FCE when it concluded the Healthsouth FCE was of "limited value" because it did not establish Green could work "40 hours a week, week after week." It is true an FCE can only provide a "snapshot" of a claimant's functional capacities, but this does not render the FCE of "limited value." An FCE

-11-

provides "objective clinical evidence" regarding how a benefits claimant's medical conditions affect his or her ability to work. *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). This court has endorsed the use of FCEs in evaluating the effect of fibromyalgia on ERISA benefits claimants. *See, e.g., Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006) (stating plaintiff's failure to submit an FCE in support of her disability may have affected the benefits determination); *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974 (8th Cir. 2003) (stating functional capacity assessment that indicated plaintiff was not disabled supported plan administrator's benefits denial decision).

An FCE need not establish conclusively that a benefits claimant will be capable of working day after day, week after week, year after year. Rather its value is in objectively evaluating a person's work capacities. In this case, an evaluation of Green over the course of two days in February of 2002 established that he was capable of working in a sedentary position, in contradiction to the other evidence Green submitted that tended to indicate he was disabled. The district court made no criticism of the methodology Healthsouth used in evaluating Green, and we see nothing in the record sufficient to question the accuracy of the Healthsouth FCE's results. The Healthsouth FCE constitutes evidence in support of Union's decision to deny LTD-benefits to Green.

Second, the district court also improperly determined the medical opinions of Drs. Parmet and Maikranz did not support Union's denial of Green's LTD-benefits claim because those opinions were based on the Healthsouth FCE. The district court's conclusion that these opinions were based entirely or substantially on the Healthsouth FCE is not supported by the doctors' reports. Each doctor reviewed Green's entire medical record and concluded Green was capable of working in a sedentary job. While both doctors referred to the Healthsouth FCE in their conclusions, their reports do not indicate the FCE was given more weight than any of the other evidence in Green's file. Given the utility of the Healthsouth FCE as an objective source of

-12-

evidence regarding Green's condition, it was proper for these doctors to base their conclusions in part on the Healthsouth FCE's results. The district court should have determined Drs. Parmet's and Maikranz's opinions constituted evidence supporting Union's decision.

Third, the district court improperly determined the two-day video surveillance Union conducted in September 2004 of Green's activities did not support its decision to deny Green's LTD-benefits claim. Like the Healthsouth FCE, the district court determined this evidence only established that Green was capable of performing sedentary work for a short period of time but did not establish that he could work a full-time job. During the surveillance, Union's investigator observed Green leave his house on several occasions to run errands, such as pumping gas and carrying VCR-sized boxes to his cable television provider's retail store. This evidence tended to contradict Green's claim of total disability and was consistent with the Healthsouth FCE.

Like an FCE, video evidence need not establish conclusively that a benefits claimant can work full time. Rather, video evidence provides another form of objective evidence upon which an ERISA plan administrator may base its claims determinations. The use of video surveillance to observe a benefits claimant's condition is reasonable. *Cusson v. Liberty Life Assur. Co. of Boston*, 592 F.3d 215, 229 (1st Cir. 2010); *see also Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 609 (7th Cir. 2007) ("In short, the videotapes show [the claimant] engaging in many of the activities that she claimed to be unable to accomplish in her application for long-term disability benefits and, consequently, the Plan properly considered them.").[5]   Union's

---

[5] This court's decision in *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173 (8th Cir. 2003), does not compel a conclusion that Union's video surveillance of Green cannot constitute evidence in support of its denial of Green's LTD-benefits claim. In *Morgan*, the court determined video surveillance of a benefits claimant's activities was not substantial evidence because the insurer was already aware that the

-13-

observations of Green over a two-day period functioning with little to no apparent difficulty (when Green had no reason to believe he was being observed) is evidence supporting Union's denial of Green's benefits claim.

Fourth, the district court improperly discounted the findings of the vocational labor market studies that indicated Green could find gainful employment. The district court concluded "a reasonable person cannot have any confidence in Union's labor market survey because of the way it has been repeatedly revised." Neither the district court nor Green cite to any authority, and we find none in our review, standing for the proposition that a labor market study cannot constitute evidence supporting an ERISA plan administrator's denial of benefits merely because it has been revised to eliminate certain jobs the study initially found a benefits claimant was capable of performing. Transferrable skills and labor market studies, like the ones Union conducted in this case, can constitute substantial evidence supporting a denial of benefits. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 805, 808 (8th Cir. 2002); *see also Russell v. Paul Revere Life Ins. Co.*, 288 F.3d 78, 82 (3d Cir. 2002) (acknowledging administrator's reliance on a labor market report, which concluded benefits claimant was only partially disabled, supported administrator's denial). The fact that Union revised its LMS and eliminated positions that Green was unable to perform suggests Union fairly and reasonably reviewed Green's claim. After these revisions to the LMS, Union ultimately concluded Green could work in a customer service position, and this is evidence supporting Union's decision.

Finally, beyond the evidence the district court discounted, there is other evidence in the record supporting Union's decision. In an interview with a Union

claimant "routinely engaged in the type of activity that [the insurer] later observed through surveillance and used as the basis for discontinuing [the claimant's] benefits." *Id.* at 1178. In Green's case, Union's surveillance disclosed Green was capable of engaging in activities that his treating physicians did not believe he could perform, including "grasping, handling and reaching."

-14-

Vocational Services employee in April 2002, Green stated he could still fish and camp after the onset of his disability. Green's treating physician, Dr. Rettinger, also repeatedly stated he anticipated Green would be able to return to work in a sedentary job even with his fibromyalgia diagnosis. Further, as the district court correctly concluded, the record did not establish that Green suffered from a disabling psychological condition. We think the cumulative nature of this and the other evidence constitutes more than a scintilla of evidence indicating Green is not "disabled" under the Policy's definition.

Although Green likely suffers from fibromyalgia, it does not automatically follow that this condition renders Green "disabled." *See Coker*, 281 F.3d at 798-99 (recognizing insurer determined ERISA benefits claimant suffered from diabetes, but that this condition did not render the claimant disabled under the ERISA plan). Reasonable minds can differ, based on the record, as to how Green's condition affects him. However, our duty is to determine whether Union's decision was supported by substantial evidence, not to weigh the evidence anew. *Ferrari*, 278 F.3d at 807 ("We do not … substitute our own weighing of the evidence for that of the administrator.") Substantial evidence supports Union's decision to deny LTD benefits to Green, and "a reasonable person *could* have reached a similar decision." *Midgett*, 561 F.3d at 897. Union did not abuse its discretion in denying Green's LTD-benefits claim.

## C.     Union's Structural Conflict of Interest

The fact that Union operates under a structural conflict of interest, as both plan administrator and insurer, does not warrant a finding that Union abused its discretion in denying Green's claim. A plan administrator's conflict of interest "'should be weighed as a factor in determining whether there is an abuse of discretion.'" *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008)). The weight of an administrator's conflict will depend on the circumstances.

The conflict of interest … should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.… It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117 (internal citation omitted).

The importance of Union's conflict is at or near the "vanishing point." Although the district court ordered discovery on Union's conflict of interest, the district court cited none of this disclosed information in concluding that Union's conflict influenced its decision to deny LTD benefits to Green. Further, there is no other indication that Union has a history of biased claim decisions.

Although the SSA ultimately determined Green was disabled for the purposes of receiving SSD benefits, this determination was not binding on Union. The evidence presented to the SSA was different from the evidence before Union. *See Jackson*, 303 F.3d at 889 (recognizing it was not certain whether the SSA would have concluded the benefits claimant would be entitled to SSD benefits if the SSA had reviewed the same record that was before the ERISA plan administrator). Also, the SSA was required to (and the ALJ did) give special deference to Green's treating physicians. Union, however, was not required to give special deference to Green's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The circumstances of this case do not warrant increasing the importance of Union's structural conflict of interest as a factor for evaluating whether Union abused its discretion in denying LTD benefits to Green.

-16-

III.

The district court's order granting summary judgment for Green is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.[6]

———————————————

———————————————

[6] We need not address whether the district court abused its discretion in granting leave to Green to conduct limited discovery on Union's structural conflict of interest. *Cf. Werdehausen v. Benicorp Ins. Co.*, 487 F.3d 660, 669 (8th Cir. 2007) ("As we have reversed the grant of summary judgment dismissing the Werdehausens' ERISA claims under 29 U.S.C. § 1132(a)(1)(B), we need not address their arguments that the district court committed evidentiary and discovery errors in the summary judgment proceedings.").