# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3260
_____

CeCelia Catherine Ibson

*Plaintiff - Appellant*

v.

United Healthcare Services, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: October 18, 2017
Filed: December 6, 2017
_____

Before WOLLMAN, BEAM, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

A thorny dispute between CeCelia Ibson and United HealthCare Services, Inc. ("UHS") has returned once more to this court. After we decided ERISA preempted her state-law claims, Ibson filed claims under ERISA against UHS. The district court dismissed her complaint, while noting that—if her allegations were true—UHS treated her "horribly." The question before us, then, is whether Ibson has pled a viable claim against UHS under ERISA. We largely agree with the district court's

dismissal of her claims, but remand for further inquiry into her equitable claim for premiums she paid to UHS.

I.

Ibson was at one time a shareholder in an Iowa law firm that contracted with UHS to provide health insurance for its employees. On Ibson's prior appeal, we noted that the "law firm remitted payment to the insurance company and distributed information from UHS . . . but performed no other administration relating to the insurance." Ibson v. United Healthcare Servs., Inc., 776 F.3d 941, 943 (8th Cir. 2014). UHS, however, expressly disavowed the "plan administrator" role in the policy document, and no other entity was named to fill that role. J.A. 112.

Ibson enrolled herself and her family, including her late husband, Jay Wagner, in her employer-sponsored UHS healthcare plan in March 2004. In early 2008, UHS began denying claims and started instituting recoupment actions for claims already paid.[1] This was at a time of great hardship for Ibson's family: Wagner was battling metastatic melanoma. In April 2008, UHS sent an email promising to return Ibson's policy and coverage to normalcy.[2] Ibson's law firm cancelled the policy in June 2008, but UHS continued recoupment actions—despite its earlier email—into 2010. UHS eventually paid $36,417.29 for outstanding claims. Ibson maintains in this action, however, that they still owe $190,579.91 in relation to care Wagner received.

---

[1]As we noted in our previous opinion, "the record is unclear as to why UHS began denying coverage." Ibson, 776 F.3d at 943. The record has not become any clearer in the instant action.

[2]The email, in part, stated that UHS would "stop recoupment proceedings . . . reprocess [incorrectly denied] claims," and "contact all of Ibson's medical providers to explain UHS's error and to promise that Ibson's claims would be correctly processed." Id.

Ibson filed suit initially in September 2012, alleging state-law claims against UHS. As noted above, on appeal, we held that Ibson's claims were preempted by ERISA. Id. at 946. She re-filed a complaint against UHS in July 2015 and subsequently amended it in November 2015.[3] The first three counts of the amended complaint were ERISA based, and the last count was again a state-law claim. The complaint sought the value of alleged unpaid benefits and of premiums paid by Ibson to UHS (Count I), statutory damages for UHS's failure to dutifully carry out the task of "plan administrator" (Count II), attorney fees (Count III), and damages arising from a breach of contract in relation to the April 2008 email (Count IV). On a partial motion to dismiss, the district court dismissed Count IV as preempted by ERISA, and later, on summary judgment, it dismissed Counts I, II, and III. Ibson now appeals.[4]

## II.

We review the district court's dismissal on summary judgment of Counts I and II, and dismissal of Count IV for failure to state a claim, de novo. See Odom v. Kaizer, 864 F.3d 920, 921 (8th Cir. 2017) (summary judgment); K.T. v. Culver-Stockton Coll., 865 F.3d 1054, 1057 (8th Cir. 2017) (failure to state a claim).

## A.

Viewed in a light most favorable to Ibson, Kaizer, 864 F.3d at 921, Count I of her amended complaint seeks relief under two different, interrelated sections of ERISA. We deal with each in turn.

---

[3]UHS opposed her motion to amend, but Ibson was allowed to file her amended complaint in December 2015.

[4]Ibson does not appeal the district court's dismissal of Count III.

1.

Pursuant to 29 U.S.C. § 1132(a)(1)(B), Ibson seeks to recover $190,579.91 in alleged "unpaid benefits," which stem solely from care Wagner received. The district court characterized her claim as seeking "extra-contractual damages"—forbidden under ERISA. Regardless, the correct party to bring this claim is Wagner's estate.

We begin with the statute. Section 1132(a)(1)(B) provides a cause of action for an ERISA "participant or beneficiary . . . to recover benefits due *to him* under the terms of his plan." (emphasis added).[5] Flowing from that statutory language, we have held that it is "the representative of a deceased participant's estate [that has] standing to sue for breach of ERISA fiduciary duties." Geissal ex rel. Geissal v. Moore Med. Corp., 338 F.3d 926, 931 (8th Cir. 2003) (citing Shea v. Esensten, 107 F.3d 625, 628 (8th Cir. 1997)). This comports with the general principle that "death usually does not moot a claim for monetary compensation . . . because the individual's estate or someone else legally eligible to recover the monetary claim" may bring it. Cobell v. Jewell, 802 F.3d 12, 23 (D.C. Cir. 2015).

The fact that Ibson was the plan "participant" is of no significance. The alleged benefits accrued to Wagner for his treatment as a "beneficiary," and § 1132(a)(1)(B) provides a cause of action to the "participant or beneficiary" to whom benefits were "due." Bolstering this conclusion is the opinion in Harrow v. Prudential Insurance Company of America, 279 F.3d 244 (3d Cir. 2002)—a decision cited as support for our holding in Geissal. There, a plan participant was granted standing to sue for benefits owed a deceased beneficiary solely because she was the

[5]Under ERISA, a "participant" is an "employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(B)(7). A "beneficiary" is a "person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(B)(8).

administrator of the decedent-beneficiary's estate, and thus "[stood] in the shoes of the decedent." Id. at 248 & n.7 (internal quotation marks omitted). Thus, for benefits "due to [Wagner]," § 1132(a)(1)(B), a legal representative of his estate must bring the claim, not Ibson in her personal capacity.

2.

Ibson also asks "for a full refund of the premiums she paid UHS, as well as the funds possessed by UHS which should have been paid on claims submitted, pursuant to 29 U.S.C. § 1132(a)(3)(B)." This provision allows for "*appropriate equitable relief* to redress violations . . . of ERISA or the terms of the plan." CIGNA Corp. v. Amara, 563 U.S. 421, 438 (2011) (internal quotation marks omitted). The district court found that she was seeking "compensatory relief" which "does not fall within the ambit of 'appropriate equitable relief.'" Because of this, it did not consider whether a plan violation had occurred.[6] As an initial matter, we remand to determine whether there is a redressable plan violation in light of UHS's admission in this action that it owes, and has not paid, $190,579.91 to Wagner's medical providers. See Appellant's Br. 28 ("The $190,579.91 benefit that [UHS] received from the writing off of Mr. Wagner's medical bills after his death . . . [was] a benefit conferred by the providers").[7] This determination is necessary because, as explained below, we find that Ibson has a cognizable equity claim to premiums paid to UHS.

---

[6]Ibson bases her claim for equitable relief solely on alleged plan violations.

[7]A "charge off" (or "write off") does not extinguish debt or a legal obligation to pay. Instead, this is an accounting procedure that allows a creditor to treat a debt "as a loss or expense because payment is unlikely." See *Charge Off*, Black's Law Dictionary (10th ed. 2014).

Equitable relief under §1132(a)(3)(B) "is limited to those categories of relief that were *typically* available in equity during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate)." Montanile v. Bd. of Trustees of Nat'l. Elevator Indus. Health Benefit Plan, 136 S. Ct. 651, 657 (2016) (internal quotation marks omitted). We look to "cases and secondary legal materials to determine if the relief would have been equitable in the days of the divided bench." Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 362 (2006) (internal quotation marks omitted). Using this framework, we assess Ibson's claims to (1) alleged unpaid benefits relating to Wagner's care and (2) premiums she paid to UHS while she had a policy with it.

i.

To start, Ibson's claim in equity for alleged unpaid benefits fails because it violates a fundamental maxim of equity jurisprudence: "equity follows the law." 1 Joseph Story, Commentaries on Equity Jurisprudence § 64 (12th ed. 1877). As Justice Story explained, "[w]here a rule [of] . . . the statute law is direct and governs the case with all its circumstances, or the particular point, a court of equity is as much bound by it, as a court of law." Id. Here, there is a statutory provision that governs the recovery of benefits, § 1132(a)(1)(B), and—as discussed above—that provision allows only the person to whom benefits were due to recover. For that reason, granting Ibson's claim in equity for alleged unpaid benefits for Wagner's care—a claim that Wagner'e estate would have to bring in law—would violate a core tenet of equity jurisprudence.

Furthermore, this reasoning is consistent with our duty "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Does v. Gillespie, 867 F.3d 1034, 1043 (8th Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012)). As a result, "we are hesitant to adopt an interpretation of a congressional enactment

which renders superfluous another portion of that same law." United States v. Jicarilla Apache Nation, 564 U.S. 162, 185 (2011) (internal quotation marks omitted). Indeed, allowing Ibson to seek in equity what she cannot seek at law would render the textual strictures of exactly who may seek unpaid benefits under § 1132(a)(1)(B) "superfluous." Our reading of § 1132(a)(3)(B) in light of the maxims of equity, therefore, aligns with bedrock statutory interpretation principles, and we decline to consider Ibson's claim for alleged benefits due to Wagner in equity.

ii.

Next, we examine Ibson's claims for premiums paid to UHS. She asserts two theories of equity to recover them: reformation and restitution. The "reformation remedy available under § 1132(a)(3)," however, "allow[s] courts to reform contracts that failed to express the agreement of the parties." Silva v. Metropolitan Life Ins. Co., 762 F.3d 711, 723 (8th Cir. 2014) (internal quotation marks omitted). Here, Ibson and UHS do not disagree as to the contours of the policy—in other words, they agree on what it actually covered. They disagree about whether UHS is in violation of the policy. Thus, reformation is inapposite here because there is no need to reform the policy to "capture the terms upon which the parties had a meeting of the minds." Gabriel v. Alaska Elec. Pension Fund, 773 F.3d 945, 955 (9th Cir. 2014) (internal quotation marks omitted).

As for Ibson's claim for premiums under restitution, "not all relief falling under the rubric of restitution is available in equity." Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002). A restitution claim is cognizable in equity only if "money or property belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession." Id. at 213. In Sereboff, the Court found an action equitable where recovery was sought on "a specifically identified fund, not from the [defendant's] assets generally." 547 U.S. at 363. Much like in Sereboff, Ibson has identified specific funds—her

-7-

premiums—that are potentially in UHS's possession. As a result, the restitutionary remedy she seeks for her premiums is equitable. Cf. Cent. States, Se. & Sw. Areas Health & Welfare Fund v. First Agency, Inc., 756 F.3d 954, 960 (6th Cir. 2014) (finding relief requested to be legal rather than equitable because plaintiff's request had "no connection to any particular fund at all," and defendant could "satisfy that obligation by dipping into any pot it chooses").

But, that does not end the inquiry. Ibson must still show that the funds (her premiums) have not "dissipated." Montanile, 136 S. Ct. at 659 (restitution inappropriate where "defendant once possessed a separate, identifiable fund . . . but then dissipated it all"). The critical question is whether Ibson's premiums are "separate from [UHS's] general assets"—rather than "mixed" with those assets—"or dissipated . . . on nontraceable assets." Id. at 662. If the funds are indeed separate, an equitable remedy to her premiums is potentially available to Ibson under § 1132(a)(3)(B).

3.

In sum, we agree with the district court that Ibson does not have a claim to alleged unpaid benefits due to Wagner under § 1132(a)(1)(B). We also find that she cannot bring this claim in equity under § 1132(a)(3)(B). But, a restitutionary claim for premiums she paid under § 1132(a)(3)(B) is potentially available to her if there was a plan violation. We remand to the district court to determine initially if there was such a plan violation and, if so, whether restitution of Ibson's premiums is "appropriate equitable relief" under § 1132(a)(3)(B).

B.

Count II of Ibson's complaint alleges that UHS "failed to discharge its duties and obligations as [p]lan [a]dministrator" and is subject to a civil penalty of $100 per

day under 29 U.S.C. § 1132(c)(1)(B). The district court dismissed this count because UHS was not the "plan administrator." The district court was correct: the only entity that may be fined under § 1132(c)(1)(B) is the plan administrator, and UHS was not it in this case.

Ibson argues that UHS was the "de facto plan administrator" because the plan certificate and policy do not name UHS as the plan administrator. This argument is, however, unavailing under our cases. See Brown v. J.B. Hunt Transp. Servs., Inc., 586 F.3d 1079, 1088 (8th Cir. 2009) ("Governing precedent forecloses . . . argument that Prudential was the 'de facto plan administrator.'").[8]

More importantly, ERISA, by its plain language, forecloses this argument: where a plan administrator is not explicitly designated, as is the case here, the "plan sponsor" is also the plan administrator. 29 U.S.C. § 1002(16)(A)(ii). Here, under ERISA, Ibson's former law firm was the plan sponsor. § 1002(16)(B)(i). Therefore, it was also the plan administrator. While this may seem at odds with the functional roles the law firm and UHS played, the statutory language of ERISA compels the conclusion that the law firm was the plan administrator in this case, and our role is

---

[8]Ibson cites a number of out-of-circuit cases in support of her de facto plan administrator argument. Out of the cases she cites, Law v. Ernst & Young, 956 F.2d 364, 374 (1st Cir. 1992), is perhaps the strongest support for her argument because it recognized that a § 1132(c)(1)(B) penalty could be imposed on a de facto plan administrator. But, even the court in Law recognized it was dealing with a factually unique case. As the First Circuit held recently, Law "was careful to distinguish the case before it, which involved an employer with 'little, if any, separate identity' from [entity designated] as 'plan administrator,' from cases involving 'attempts to recover against entities which were clearly distinct from the plan administrator.'" Tetreault v. Reliance Standard Life Ins. Co., 769 F.3d 49, 60 (1st Cir. 2014) (quoting Law, 956 F.2d at 374) (dismissing de facto plan administrator argument).

"to apply, not amend, the work of the People's representatives." Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1726 (2017).

## C.

Finally, Count IV of Ibson's complaint alleges a breach of contract in relation to the email sent by UHS in April 2008. The district court held this count was preempted by ERISA. We agree.

Ibson argues that the email was a "settlement agreement" that UHS breached by failing to follow through on the commitments laid out in it. Putting aside whether the email was a "settlement agreement" or not, this claim is preempted by ERISA. Given the "extraordinary pre-emptive power" of "the ERISA civil enforcement mechanism," Aetna Health, Inc. v. Davila, 542 U.S. 200, 209 (2004), any claim "[1] that ha[s] a connection with or [2] reference[s] [an ERISA] plan" is "preempted" by ERISA. Estes v. Fed. Express Corp., 417 F.3d 870, 872 (8th Cir. 2005) (first and third alterations in original) (internal quotation marks omitted). Here, as we described before, the email was solely about the steps UHS would take to ensure the smooth administration of Ibson's ERISA plan. See supra note 2. Accordingly, "because the essence of [Ibson's] claim relates to the administration of plan benefits, it falls within the scope of ERISA." Parkman v. Prudential Ins. Co. of Am., 439 F.3d 767, 771-72 (8th Cir. 2006).

## III.

For the foregoing reasons, we affirm the district court's dismissal of Count I as it pertains to Ibson's claim to benefits under §§ 1132(a)(1)(B) and 1132(a)(3)(B), Count II, and Count IV. We reverse the district court's decision on Count I with regards to Ibson's claim to premiums paid under § 1132(a)(3)(B). On remand, consistent with this opinion, the district court should consider (1) if a plan violation

-10-

occurred and if so, (2) whether restitution of Ibson's premiums is "appropriate equitable relief" under § 1132(a)(3)(B).

_____