# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-2233

_____

Salvador Silva

*Plaintiff - Appellant*

v.

Metropolitan Life Insurance Company; Savvis Communications Corporation

*Defendants - Appellees*

------------------------------

Thomas E. Perez, Secretary of U.S. Department of Labor

*Amicus on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 14, 2014
Filed: August 7, 2014

_____

Before GRUENDER, BRIGHT, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Abel Silva ("Abel") died on June 27, 2010. His father, Salvador Silva ("Silva"), sought to recover the benefits of Abel's life insurance policy. The insurer denied Silva's claim, asserting that Abel did not actually have a policy because he had not provided required paperwork. Silva brought suit against Abel's employer, Savvis Communications Corporation ("Savvis"), and the insurer, Metropolitan Life Insurance Company ("MetLife"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. The district court denied relief, and Silva appeals. For the reasons below, we reverse and remand.

I.    Background

Silva's son, Abel, began working at Savvis in September 2004. Abel was eligible to purchase Supplemental Life Insurance benefits when he started his job but declined to do so. He signed the following statement at that time:

> I have been given the opportunity to enroll in SAVVIS Communications Corporation's Group Supplemental Life Insurance plans. I understand that if I decline now, but later decide to enroll, I will be required to provide evidence of good health that is satisfactory to Hartford Life and understand my request for coverage may be denied.[1]

Several years later, Abel decided he wanted Supplemental Life Insurance and enrolled for a policy through Savvis's online enrollment system. He requested a coverage level of five times his salary, which amounted to $429,000. Abel's benefits were apparently scheduled to take effect on January 1, 2010, and the policy appeared on Abel's "Benefits Election Package" page on the Savvis intranet.[2] Savvis withheld

---

[1]Hartford Life was the prior insurer for the Savvis Plan. MetLife became the insurer in 2008.

[2]Defendants, Saavis and MetLife, stress that this web page merely showed insurance policies Abel had selected, rather than insurance policies that had been

approximately $10 from Abel's bi-weekly paychecks for the policy until Abel died on June 27, 2010. He had paid roughly $128 in premiums for the life insurance policy.

Abel had named Silva as his policy's beneficiary. Following Abel's death, Silva requested payment of the life insurance proceeds from MetLife. MetLife denied Silva's claim because the company believed that Abel had not successfully completed the enrollment conditions required to obtain a supplemental life insurance policy. In particular, MetLife required that Abel provide "evidence of insurability" before MetLife would approve his request for insurance. In MetLife's letters of denial to Silva, and in several internal MetLife communications, various MetLife representatives indicated that the company requires "evidence of insurability" (1) in all instances of late requests[3]; and (2) for requests of coverage in excess of three times an employee's base salary amount, whether such requests are timely or not. At least one internal MetLife communication involved MetLife representatives discussing a grant of partial coverage to Abel. In that communication, one of the representatives raised the issue of granting Abel three times his base salary amount as a life insurance benefit, presumably because MetLife considered three times the base salary generally not to require evidence of insurability. Ultimately, however, MetLife asserted in its letters to Silva that Abel was required to provide evidence of insurability to obtain any coverage due to the fact that his request was a late request.

Evidence of insurability is explained in the Savvis Plan ("the Plan"), which is 96 pages long. Two of those pages describe MetLife's "Evidence of Insurability" requirement. Under the "Eligibility Provisions: Insurance for You" page, it reads, in part:

---

approved. We note that the screen shot of Abel's "Benefits Election" web page does not say whether his insurance selections were approved.

[3]MetLife defines a late request for coverage as a request made 31 days or more after becoming eligible.

ENROLLMENT PROCESS

If You are eligible for insurance, You may enroll for such insurance by completing the required form. In addition, You must give evidence of Your Insurability satisfactory to Us at Your expense if You are required to do so under the section entitled EVIDENCE OF INSURABILITY.

The EVIDENCE OF INSURABILITY section reads, in part:

We require evidence of insurability satisfactory to Us as follows: . . .

5.      [I]f You make a request during an annual enrollment period to increase the amount of Your Supplemental Life Insurance to an option which is more than one level above Your current amount of Supplemental Life Insurance

If You do not give Us evidence of insurability or the evidence of insurability is not accepted by Us as satisfactory, the amount of Your Supplemental Life Insurance will not be increased. . . .

9.      [I]f You make a late request for Supplemental Life Insurance.  A late request is one made more than 31 days after You become eligible.

If You do not give Us evidence of insurability or the evidence of insurability is not accepted by Us as satisfactory, You will not be covered for Supplemental Life Insurance.

Because Abel electronically selected a policy coverage level that required evidence of insurability, Savvis asserts that a prompt window appeared on his computer screen.  The prompt allegedly notified Abel to contact the Savvis Benefits Department (located in the same office building as Abel) to complete a Statement of Health form, which was a necessary step to fulfill MetLife's evidence of insurability requirement.  Savvis would then send the form to MetLife for review and approval or denial of a life insurance policy.

We pause here to emphasize four points: First, there is no mention of a Statement of Health form anywhere in the Savvis Plan, only that plan participants must provide evidence of insurability. In fact, there are no directions at all for how to fulfill the evidence of insurability requirement. Second, Defendants have not produced a copy of a Statement of Health form or any other evidence regarding what information MetLife required plan participants to provide. Third, Defendants have not provided evidence of the online prompt, which they assert notified Abel of the Statement of Health form requirement. The only evidence that this prompt existed is a single internal memo from a MetLife representative stating that such a prompt exists, but without providing any additional information such as the text included in the prompt or a screen capture.[4] That memo, which is in the form of a call log comment section, reads: "ee's complete their enrollment online and if they elect more than 3x their bae [basic annual earnings] they r prompted to complete a paper soh [statement of health] and submit that to their HR dept. HR does not follow up on if the SOH was completed or not as it is the ee's responsibility to complete[.]" Finally, as discussed below, it was later revealed that around 200 other Savvis employees similarly had not submitted their Statement of Health forms, or if they had, they had not been provided to MetLife.

MetLife addressed and defended some of these complications in its benefits denial letter to Silva's attorney, which stated, in part:

> Even though evidence of insurability is not defined in the Plan, the online enrollment system advised [Abel] of the Statement of Health requirement. Regardless, . . . the Plan requires that evidence of insurability be 'accepted by Us as satisfactory.' MetLife requires a Statement of Health, which is then reviewed in connection with

---

[4]At oral argument, Defendants' counsel could not explain why evidence of this online prompt was not in the record and hypothesized that Savvis must have changed the computer system and that the prompt was no longer in use.

underwriting. [Abel's] attendance at work with no health issues is not sufficient proof of evidence of insurability. Finally, premium payments are not a guarantee of coverage and the acceptance of premium payments in error does not create coverage under an ERISA-governed Plan.

Further, Defendants are unsure whether Abel received a copy of the Plan (which contained information regarding the evidence of insurability requirement), and if he did, when and how he received it. Defendants claim that Abel should have received a copy of the Plan at some point, either when he was first hired at Savvis and declined coverage or when he later signed up for supplemental life insurance in January 2010. In any case, the Plan was available for viewing on the Savvis intranet.

ERISA mandates that plan administrators provide a condensed and understandable Plan explanation, in the form of a summary plan description, to plan participants.[5] 29 U.S.C. §§ 1022, 1024(b). A summary plan description is required to advise participants, in plain and simple terms, how to obtain coverage and in what instances participants can lose coverage, such as by not providing evidence of insurability. See § 1022. MetLife contends that the Plan itself, which is nearly 100 pages, also functioned as the Plan's summary plan description. It appears that no separate summary plan description existed for the Plan.

After this lawsuit began, MetLife conducted an internal investigation to see if other Savvis Plan policy holders also did not have an approved Statement of Health form on file. The company discovered around 200 Savvis employees lacked this documentation.[6] Savvis notified these employees and allowed them to correct or

---

[5]The Plan is an ERISA-governed plan. 29 U.S.C. § 1003. Savvis is the plan administrator, and MetLife is also a plan fiduciary.

[6]The internal investigation log includes, in part, the following note from what appears to be a MetLife employee: "There are a whole truckload of people who filled out a SOH but they were never submitted due to a glitch in the employer's enrollment

submit the required documents but did not allow Silva to do so.[7] Silva points out that Defendants have not shown any disqualifying health condition or activity that would have prompted MetLife to deny Abel life insurance coverage had they received a completed Statement of Health form from him.

## II.    Procedural History

As noted above, MetLife, the plan fiduciary responsible for reviewing claims,[8] denied Silva's claim for Abel's supplemental life insurance benefits.  MetLife determined that Abel's request for supplemental life insurance was never approved by MetLife because Abel did not submit a Statement of Health form.  Silva sued MetLife and Savvis in Missouri state court, and Defendants removed the case to the

_____

process."

[7]At oral argument, Defendants' counsel stated that many of these Savvis employees had filled out Statement of Health forms, but that Savvis had neglected to send the completed forms to MetLife.  Defendants' counsel argued that this fact distinguishes the grandfathered policies from Abel, since according to Defendants, Abel had not filled out a form at all.  We find this distinction unpersuasive because the end result—MetLife failing to receive the forms to make a coverage determination on a request for supplemental life insurance—is the same.

[8]MetLife and Savvis both have fiduciary obligations to plan participants under ERISA because they are both administrators of the Plan.  See 29 U.S.C. §§ 1002(16)(A) (definition of "administrator"), 1102(a)(1) ("Every employee benefit plan . . . shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."), 1002(21)(a) (definition of a "fiduciary" under ERISA), 1104(a)(1)(B) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.")

Eastern District of Missouri. 28 U.S.C. § 1441. In his complaint, Silva claimed ERISA allowed him "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B)

After the deadline set by the district court passed, Silva moved to amend his complaint to add a cause of action under 29 U.S.C. § 1132(a)(3), which allows "a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" (emphasis added). When analyzing the untimely amendment, the district court noted that Silva had shown good cause due to later-discovered facts (notably, the information that 200 other Savvis employees also should have submitted a Statement of Health form but did not). The district court, however, found that the phrase "other appropriate equitable relief under § 1132(a)(3)(B)" did not allow Silva to claim life insurance benefits because that would be a compensatory remedy, not an equitable one. Because Silva's claim could not provide him with the relief he sought, the district court denied Silva's request to amend as futile.

After denying Silva's motion to amend the complaint, the district court granted summary judgment in favor of Defendants on Silva's § 1132(a)(1)(B) claim. The district court found that the nearly 100-page Plan could double as a summary plan description and was "distributed to employees and available on Savvis' intranet." Silva v. Metropolitan Life Ins. Co., 912 F. Supp. 2d 781, 787 (E.D. Mo. 2012). The district court also found that "the enrollment Abel completed online prompted him to complete a statement of health form." Id. at 788. Thus, the court found that MetLife had not abused its discretion when it denied Silva's claim to Abel's life insurance benefits. The district court also found that, even if MetLife erroneously deducted insurance premiums from Abel's paychecks, such error did not constitute

a waiver of the evidence-of-insurability requirement. Thus, the district court concluded that Abel had not completed the requirements for obtaining approval for a late-enrollment supplemental life insurance policy, and therefore, MetLife did not owe Silva payment under the terms of any such policy.

Silva appeals the district court's grant of summary judgment on his § 1132(a)(1)(B) claim and the district court's denial of his motion to amend his complaint to add a claim under § 1132(a)(3).

III.    Analysis

The Savvis Plan provides that Metlife, as a plan fiduciary, "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." When a plan grants an administrator this type of discretion, the district court reviews the "administrator's construction of the plan terms for an abuse of discretion; and we review de novo the district court's application of that deferential abuse-of-discretion standard." Tussey v. ABB, Inc., 746 F.3d 327, 333 (8th Cir. 2014) (internal quotation marks omitted). "[A]n administrator's decision is upheld if it is reasonable, that is, supported by substantial evidence . . . [which] means 'more than a scintilla but less than a preponderance.'" Darvell v. Life Ins. Co. of N. Am., 597 F.3d 929, 934 (8th Cir. 2010) (citations omitted).

In this case, MetLife had the responsibility of both determining eligibility for benefits and also paying those benefits. This dual role creates a conflict of interest. Manning v. Am. Rep. Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010). In such cases, our circuit recognizes that this conflict can "trigger a less deferential standard of review" before reviewing courts. Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1197 (8th Cir. 2002). While our circuit has not definitively articulated what that less deferential standard of review should be, we have said that "a reviewing court should

-9-

consider that conflict as a factor" when determining if an administrator has abused its discretion. Manning, 604 F.3d at 1038. We do so here.

A.     § 1132(a)(1)(B) Claim

The district court granted summary judgment to Defendants because it found that Silva was not entitled to benefits under the Plan. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the grant of summary judgment de novo, "considering all evidence in the light most favorable to, and making all reasonable inferences for, the nonmoving party." Carmody v. Kan. City Bd. of Police Comm'rs, 713 F.3d 401, 404 (8th Cir. 2013).

Section 1132(a)(1)(B) allows Silva to bring a civil action "to recover benefits due to him under the terms of his plan." Defendants argue that Silva is not entitled to "recover benefits under the terms of his plan" because the terms of the Plan required Abel to submit evidence of insurability as a late enrollee. Silva argues that § 1132(a)(1)(B) entitles him to benefits owed under the Plan. To succeed, Silva must show that MetLife's determination that he had not provided "evidence of insurability" was an abuse of discretion. See Manning, 604 F.3d at 1039. We look at the following five factors when making this determination: "(1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation." Manning, 604 F.3d 1030, 1041–42. In addition to these five factors, we keep in mind MetLife's conflict and weigh that accordingly. See id. at 1038.

-10-

Silva's § 1132(a)(1)(B) argument turns on the following question: What does the phrase "evidence of insurability" mean in the Plan? The Plan itself does not define the phrase. MetLife only requires evidence of insurability in a few instances— (1) when a person elects coverage exceeding three times his or her base salary, or (2) when a person enrolls in a policy more than a month after first being eligible. Among other reasons, MetLife has an interest in not allowing those who may be very ill from taking out a large life insurance policy shortly before death. Evidence of insurability allows MetLife to scrutinize certain policy selections before approving an untimely policy request. However, it is unclear what evidence of a person's health the Savvis Plan required. MetLife asserts that plan participants satisfy this prerequisite for coverage by submitting a completed Statement of Health form that MetLife then approves, but that language does not appear in the Plan. In addition, there is no evidence that a summary plan description exists for the Plan, which could have explained the Statement of Health form requirement to Plan participants. Further, because there is no Statement of Health form in evidence, we do not know what information that form required.

To resolve what "evidence of insurability" means, it may be necessary to know: what Savvis communicated to Abel regarding the Statement of Health form requirement through the online prompt or otherwise; what information would be disclosed in the Statement of Health form; and whether Abel's allegedly healthy, daily presence at work could be sufficient to establish insurability. These facts are material in the sense that their resolution may show that MetLife's interpretation of the Plan is "contrary to the clear language of the plan" or that MetLife's interpretation "conflicts with the substantive or procedural requirements of ERISA" due to the seeming lack of notice to Abel of the requirements of his Plan. See Manning, 604 F.3d at 1041. We are troubled by MetLife's unsupported characterization of the facts. We have a duty to review whether MetLife abused its discretion when it denied Silva's request for the benefits of Abel's supplemental life insurance policy. These outstanding questions of material fact prevent our court from assessing whether

-11-

MetLife abused its discretion. Accordingly, we reverse and remand Silva's § 1132(a)(1)(B) claim to the district court for further proceedings.

B.    Motion to Amend—Addition of § 1132(a)(3) Claim for Equitable Relief

Silva also appeals the district court's denial of his motion to amend his complaint to add an additional ERISA claim under 29 U.S.C. § 1132(a)(3). That subsection reads:

(a) Persons empowered to bring a civil action

A civil action may be brought --

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

(emphasis added). Silva attempted to amend his complaint after the final scheduling order's deadline, which requires him to show good cause. Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). The district court found that Silva had shown good cause because he had received additional information regarding the Savvis online enrollment process. Specifically, Silva learned that roughly 200 other Savvis employees also lacked a required Statement of Health form, suggesting that there was some issue of notice regarding if and how Defendants requested this information. However, the district court denied the motion, finding that the § 1132(a)(3) claim was futile because Silva sought money damages ($429,000 in policy benefits), rather than equitable relief, which the district court concluded was unavailable under that section of the statute.

-12-

District courts have discretion to allow a party to amend his or her complaint after the scheduled deadline. See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). District courts can deny motions to amend when there "'are compelling reasons such as . . . futility of the amendment.'" Reuter v. Jax Ltd., 711 F.3d 918, 922 (8th Cir. 2013). Some examples of futile claims are ones that are duplicative or frivolous, id., or claims that "could not withstand a motion to dismiss under Rule 12(b)(6)[,]" Zutz v. Nelson, 601 F.3d 842, 850 (8th Cir. 2010). See Fed. R. Civ. P. 12(b)(6) (failure to state a claim upon which relief can be granted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ((internal quotation marks and citation omitted)); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligations to provide the grounds of his entitlement to relief requires more than labels and conclusions." (internal citations and quotation marks omitted)). Further, we "review for abuse of discretion the district court's denial of leave to amend a complaint, but when the district court bases its denial on the futility of the proposed amendments, we review the underlying legal conclusions de novo." Walker v. Barrett, 650 F.3d 1198, 1210 (8th Cir. 2011) (internal quotation marks omitted).

We agree with the district court's finding that Silva had good cause to amend his complaint after the deadline passed. Therefore, we focus our review on the district court's finding of futility. The district court held that bringing a claim for equitable relief based on the breach of fiduciary duties was futile where the relief sought was "compensation for the benefits that would have been paid but for the defendants' errors." The district court based its denial of Silva's motion mainly on Pichoff v. QHG of Springdale, Inc., 556 F.3d 728 (8th Cir. 2009). In Pichoff, the Eighth Circuit decided whether the phrase "other appropriate equitable relief" in § 1132(a)(3) allowed the plaintiff to recover life insurance he would have been

-13-

entitled to had the plan's administrator not failed to extend his coverage, an alleged breach of fiduciary duty. Id. at 731. The court explained that the term "'other appropriate equitable relief' is limited to relief that was 'typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).'" Id. (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 256–57 (1993)). Applying Pichoff, the district court in this case determined that Silva could not seek compensatory relief under § 1132(a)(3), so his claim was futile because the court could not grant that relief.

The district court also addressed the Supreme Court's more recent decision in CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), but ultimately determined that Amara did not overrule Pichoff. In Amara, the Supreme Court identified three possible "equitable" theories of recovery under § 1132(a)(3) for an administrator's breach of fiduciary duty: surcharge, reformation, and estoppel. Id. at 1879–80. Silva and the Department of Labor argue that Amara abrogated Pichoff in the sense that Amara's characterization of "other appropriate equitable relief" under § 1132(a)(3) is broad enough to encompass Silva's requested compensatory relief in this case—the full amount of the supplemental life insurance policy. We discuss below these three types of equitable claims, and we explain how Amara has changed the availability of relief and the scope of that relief.

1.      Fiduciary Duty Claim Against Savvis—Surcharge

Silva claims that Savvis, as a plan administrator, breached an ERISA-imposed fiduciary duty by failing to provide Abel with a summary plan description, which could have explained the Statement of Health form requirement as being a prerequisite. See 29 U.S.C. §§ 1109 (liability for breach of fiduciary duty), 1104 (listing the duties incumbent upon the fiduciary), 1022 (listing the description and requirements for a summary plan description), 1024(b) (stating the an administrator "shall furnish" a summary plan description to each participant). Silva argues the

-14-

absence of a summary plan description caused harm because it would have listed the requirements for enrolling in a life insurance policy in an easy-to-understand format; and, if Abel had been provided with that information, he would have completed the requirements to enroll in the Plan.[9]

Under ERISA, the plan administrator must distribute a summary plan description to all participants. 29 U.S.C. § 1022. The summary plan description "shall be written in a manner calculated to be understood by the average plan participant," § 1022(a), and it must contain, among other requirements, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," § 1022(b). The Supreme Court has said that the summary plan description's objective is to provide "clear, simple communication" that states the terms and conditions of the Plan. Amara, 131 S.Ct. at 1877. In addition, the summary plan description must be "furnished" by the plan administrator to the plan participants. See 29 U.S.C. § 1024(b)(1); see also Leyda v. AlliedSignal, Inc., 322 F.3d 199, 208 (2d Cir. 2003) ("[T]he summary plan description 'must be sent by a method or methods of delivery *likely to result in full distribution*,' that the 'administrator shall use measures *reasonably calculated to ensure actual receipt* of the material by plan participants,' and that 'in no case is it acceptable merely to place copies of the material in a location frequented by participants.'") (quoting 29 C.F.R. § 2520.104b-1(b)(1)).

Defendants argue that if no separate summary plan description existed, then the Plan can function as both. Regardless of the potential viability of such an argument in other cases, we disagree on the present facts. The Plan in this case is nearly 100 pages long and contains technical language unlikely to be read or understood by "the

---

[9]Defendants do not assert that Abel had a disqualifying medical condition or that the Statement of Health form would have alerted MetLife that Abel was ineligible for supplemental life insurance. Defendants' denial of benefits is based solely on Defendants' position that Abel did not complete a Statement of Health form.

-15-

average plan participant." 29 U.S.C. § 1022(a). It is not a "clear" and "simple" communication. Amara, 131 S.Ct. at 1877. Silva also alleges in his pleading that even if there exists a different summary plan description, it was not provided to Abel.[10] We conclude these alleged facts, if proven, show that Savvis breached its fiduciary duty to act in the interest of plan participants when it failed to provide Abel with necessary information regarding enrolling in the Plan. See Gallagher v. City of Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012) (stating that on a motion to dismiss, the court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party").

The next question we ask is whether this wrong has a remedy. We recognize that some ERISA violations do not always have remedies. See, e.g., Mayberry v. United States, 151 F.3d 855, 859 n.4 (8th Cir. 1998) ("Most of the circuits had held at the time of the settlement. . . that such damages [for a breach of fiduciary duty] were not available under ERISA."); Brown v. Ampco-Pittsburgh Corp., 876 F.2d 546, 550 (6th Cir. 1989) ("The failure to comply with ERISA's procedural requirements is not ordinarily a basis for substantive relief."). In Pichoff, our court described this phenomenon as a "remedy-less 'regulatory vacuum' created by ERISA's broad preemption of state law claims and the Supreme Court's narrow interpretation of 'other appropriate equitable relief.'" Pichoff, 556 F.3d at 732. For example, our court has held that a plan administrator's failure to distribute a summary plan description did not entitle harmed plan participants to benefits. Antolik v. Saks, Inc., 463 F.3d 796, 802 (8th Cir. 2006).

---

[10]Silva also claims it is possible Abel never received a copy of the Plan itself. Defendants suggest that Abel should have received one when he started working at Savvis, several years before he elected to sign up for life insurance coverage. Defendants also suggest that it is possible Abel received a copy of the Plan when he elected to enroll in a benefits plan, but Savvis has no evidence of this.

However, the Supreme Court's decision in Amara changed the legal landscape by clearly spelling out the possibility of an equitable remedy under ERISA for breaches of fiduciary obligations by plan administrators. Amara, 131 S. Ct. at 1881. The Amara Court directly addressed the need for this remedy, stating: "[I]t is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees. . . . We doubt that Congress would have wanted to bar those employees from relief." Amara, 131 S. Ct. at 1881.

Silva argues the remedy for his claim against Savvis is the equitable theory of surcharge. The Amara Court described equitable surcharge under § 1132(a)(3) as follows:

> Equity courts possessed the power to provide relief in the form of monetary "compensation" for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment. Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a "surcharge," was "exclusively equitable."

> The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

Amara, 131 S.Ct. at 1880 (internal citations and citations to authority omitted). To obtain relief under the surcharge theory, a plan participant is required to show harm resulting from the plan administrator's breach of a fiduciary duty. See Amara, 131 S. Ct. at 1881–82 ("We believe that, to obtain relief by surcharge for violations of §§ [1022 and 1024(b)], a plan participant or beneficiary must show that the violation injured him or her. But to do so, he or she need only show harm and causation. Although it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance,' actual harm must be shown.").

-17-

Because Silva pleads facts that, if proven to be true, could show an ERISA violation and resulting harm, and because that breach has a remedy under the equitable theory of surcharge, we reverse the district court's determination that a claim under § 1132(a)(3) against Savvis would be futile.

### 2. Fiduciary Duty Claim Against MetLife—Reformation

In addition to his claim against Savvis, Silva claims that MetLife breached its fiduciary duties to Abel by collecting insurance policy premiums from him for six months and then, after Abel's death, denying that he had a valid policy. See 29 U.S.C. § 1104(a)(1)(B) (establishing the fiduciary duties of "care, skill, prudence, and diligence"). Silva argues that MetLife's premium deductions, coupled with the facts described above, reasonably induced Abel to believe that his application for a supplemental life insurance policy was approved by MetLife and that no further action was needed, either to ensure coverage with MetLife or to acquire other insurance privately. Silva also argues that MetLife's actions should be deemed a waiver of the evidence-of-insurability requirement. The district court rejected this argument, stating that while MetLife's collection of premiums was in error, "an error is not always a waiver."[11] Silva, 912 F. Supp. 2d at 791. The district court concluded that "[a]ny confusion created by the deduction of premiums for excess insurance did not overcome the clear limitation in the plan documents."

Silva argues that MetLife "waived" the "evidence of insurability" provision in the Plan because the company appeared to approve Abel's request for coverage when it began to deduct premium payments. Silva argues a remedy for his claim exists in the equitable theory of reformation. We find support for this in Amara's discussion of reformation under § 1132(a)(3). See Amara, 131 S. Ct. at 1879. There, the Court

---

[11] The district court did order MetLife to refund Silva the amount the company had deducted from Abel's paychecks for six months, which totaled $128.76.

stated that "[t]he power to reform contracts (as contrasted with the power to enforce contracts as written) is a traditional power of an equity court, not a court of law, and was used to prevent fraud." Id. (citations omitted). On remand, the District of Connecticut described the reformation remedy available under § 1132(a)(3) as allowing courts "to reform contracts that failed to express the agreement of the parties, owing either to mutual mistake or to the fraud of one party and the mistake of the other." Amara v. CIGNA, 925 F. Supp. 2d 242, 252 (D. Conn. 2012).

On remand, Silva may be able to show mutual mistake or "fraud of one party and the mistake of the other." See Id. It was arguably fraudulent for MetLife to collect premiums from a Savvis employee who, MetLife now argues, never had an approved policy. Further, MetLife did not just erroneously collect premiums from Abel—an internal MetLife investigation showed that roughly 200 Savvis employees had been paying premiums for policies that were never approved by MetLife. We conclude that Silva is allowed to make his waiver argument on remand, and if successful, receive monetary damages, as will be discussed below.

### 3. Fiduciary Duty Claim Against MetLife—Estoppel

Because MetLife admitted error in collecting the premiums and Abel relied on that collection as proof that he had a policy, Silva argues that MetLife should also be equitably estopped from claiming that no policy existed. Again, without resolving Silva's claim on the merits, we find that this alleged wrong can survive a Rule 12(b)(6) motion because relief could be granted under § 1132(a)(3)'s catchall provision using the traditional equitable estoppel theory discussed in Amara, 131 S. Ct. at 1880. The concept of equitable estoppel is simple; it "operates to place the person entitled to its benefit in the same position he would have been in had the representations been true." Id. (citation omitted).

-19-

In Todd v. Dow Chemical Co., 760 F.2d 192 (8th Cir. 1985), the court discussed estoppel in a life insurance policy dispute where the insured-decedent received a letter stating he was insured and had premiums deducted from his policy. The court stated the requirements for showing estoppel:

> [P]rejudice or detrimental reliance is an essential element of estoppel. Courts have held that wrongful retention of premiums can satisfy the prejudice requirement. Evidence showing that the insured did not obtain additional life insurance in reliance upon the insurer's representation that the insured was covered by a policy of insurance is also sufficient to satisfy this element.

Id. at 195–96 (internal citations omitted). The court went on to find that there was no such evidence of prejudice or detrimental reliance, and because of that, the decedent's family could not recover monetary damages under the life insurance policy.

The district court in the present case quoted from a more recent Eighth Circuit case, Lincoln General Hospital v. Blue Cross/Blue Shield of Nebraska, 963 F.2d 1136 (8th Cir. 1992), for the proposition that "[i]n general, the doctrine of equitable estoppel requires proof of words or deeds (or sometimes omissions to speak or act) that create a misleading impression upon which a reasonable person would rely." Id. at 1141. The district court relied on Lincoln General Hospital to find that Defendants had no affirmative duty to tell Abel that he needed to submit evidence of insurability, stating that "[a]ny neglect by the employer and the insurer did not alter the terms of the plan placing the burden for providing the required [evidence of insurability] on the employee." Silva, 912 F. Supp. 2d at 793. Because the district court determined that Defendants did not make any misleading representations to Abel except for deducting premiums from his paycheck, the district court refused to apply equitable estoppel.

-20-

We reverse the district court and hold that Silva's § 1132(a)(3) claim based on equitable estoppel can survive a Rule 12(b)(6) motion. The evidence that MetLife collected premium payments from 200 other Savvis employees who lacked approved policies convinces us that Abel also relied on MetLife's wrongful collection of his premiums. In addition, Abel did not obtain any other supplemental life insurance policy. It is unclear what a reasonable person in Abel's position would have done differently to prevent this situation. Even if Abel read the entire Plan, he reasonably could have believed that MetLife had sufficient evidence of insurability from him or that the provision did not apply to him since MetLife began deducting premiums from his paycheck and the supplemental life insurance policy showed up on his Savvis online benefits enrollment page. Todd captures this situation succinctly: "[T]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." 760 F.2d at 196 n.2 (quoting Robert Keeton, Ins. Law Rights at Variance with Policy Provisions, 83 Harvard L. Rev. 961, 967 (1970)).

### 4. Available Relief

Because we determined that Amara changed the law as our court had previously interpreted it, we conclude a remedy may be available. The question remains, however, what might that remedy look like. At oral argument, Silva's counsel and the Department of Labor, appearing as an amicus, agreed that the appropriate remedy under § 1132(a)(3) is the payment of benefits that were seemingly owed under the Plan—$429,000. Their request for make-whole, monetary relief under § 1132(a)(3) is supported by the case law of other circuit courts of appeals. See, e.g., Osberg v. Foot Locker, Inc., 555 F. App'x 77, 80–81 (2d Cir. 2014); Kenseth v. Dean Health Plan, Inc., 722 F.3d 869, 891–92 (7th Cir. 2013) ("[Amara] substantially changes our understanding of the equitable relief available under section 1132(a)(3). [The plaintiff] has argued for make-whole relief in the form of monetary

-21-

compensation for a breach of fiduciary duty . . . We now know that, in appropriate circumstances, that relief is available under section 1132(a)(3)."); Gearlds v. Entergy Servs., Inc., 709 F.3d 448, 452 (5th Cir. 2013); McCravy v. Metro. Life Ins. Co., 690 F.3d 176, 182–83 (4th Cir. 2011); Teisman v. United of Omaha Life Ins. Co., 908 F. Supp. 2d 875, 880 (W.D. Mich. 2012) ("[T]he Court finds that § 1132(a)(3) authorizes the 'make-whole' equitable relief sought by Plaintiff because [the company] is a fiduciary."). But see Moyle v. Liberty Mut. Retirement Ben. Plan, No. 985 F. Supp. 2d 1247, 1266 (S.D. Cal. 2013) ("'Appropriate equitable relief' does not authorize suits for money damages for breach of fiduciary duty."). The Fourth Circuit stressed why allowing plan participants to seek the full amount of benefits for a breach of fiduciary obligations under § 1132(a)(3) is so important:

> [W]ith Amara, the Supreme Court clarified that remedies beyond mere premium refunds . . . are indeed available to ERISA plaintiffs suing fiduciaries under Section 1132(a)(3). This makes sense—otherwise, the stifled state of the law interpreting Section 1132(a)(3) would encourage abuse by fiduciaries. Indeed, fiduciaries would have every incentive to wrongfully accept premiums, even if they had no idea as to whether coverage existed—or even if they affirmatively knew that it did not. The biggest risk fiduciaries would face would be the return of their ill-gotten gains, and even this risk would only materialize in the (likely small) subset of circumstances where plan participants actually needed the benefits for which they had paid. Meanwhile, fiduciaries would enjoy essentially risk-free windfall profits from employees who paid premiums on non-existent benefits but who never filed a claim for those benefits. With Amara, the Supreme Court has put these perverse incentives to rest and paved the way for [the plaintiff] to seek a remedy beyond mere premium refund.

McCravy, 690 F.3d at 182–83.

We agree and direct the district court to allow Silva to amend his complaint to add his claims against Savvis and MetLife under § 1132(a)(3) based on the equitable

theories of surcharge, reformation, and equitable estoppel as described by the Supreme Court in <u>Amara</u>.

C.    Simultaneous Claims Under § 1132(a)(1)(B) and § 1132(a)(3)

Because we conclude that an equitable remedy may be available, the motion to amend cannot be rejected on a theory of futility.  We next address the separate question of whether it could be denied on the basis of redundancy.  Defendants argue that Silva should not be allowed to amend his complaint to add a claim under § 1132(a)(3) based on the Supreme Court case <u>Varity Corp. v. Howe</u>, 516 U.S. 489 (1996), which our court recently interpreted in <u>Pilger v. Sweeney</u>, 725 F.3d 922 (8th Cir. 2013).  In <u>Varity</u>, the Court discussed the interaction between the subsections in 29 U.S.C. § 1132, including the two at issue in this case, §§ 1132(a)(1)(B) and (a)(3). 516 U.S. at 512.  The Court stated that § 1132(a)(1)(B) focused upon providing a remedy for the "wrongful denial of benefits and information," while § 1132(a)(3) was a "catchall" that provided "'appropriate equitable relief' for 'any' statutory violation." <u>Id.</u>  The Court noted that this "structure suggests that these 'catchall' provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." <u>Id.</u>  The Court then concluded that "where Congress elsewhere provided *adequate relief* for a beneficiary's injury, there will be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" <u>Id.</u> at 515 (emphasis added).

In <u>Pilger</u>, our court interpreted <u>Varity</u> to stand for the proposition that if a plaintiff brings a cause of action under § 1132(a)(1)(B), then the plaintiff is barred from pursing a claim under § 1132(a)(3). <u>Pilger</u>, 725 F.3d at 927.  At oral argument, Defendants argued that Silva must choose between § 1132(a)(1)(B) or § 1132(a)(3) at the pleading stage because <u>Pilger</u> foreclosed the ability to argue for relief under both.  Under Defendants' reading of <u>Pilger</u>, injured plaintiffs would need to assess

-23-

their possible claims under 29 U.S.C. § 1132 and then select only the subsection they believed most likely to bring them the relief they seek.

We do not read Varity and Pilger to stand for the proposition that Silva may only plead one cause of action to seek recovery of his son's supplemental life insurance benefits. Rather, we conclude those cases prohibit duplicate *recoveries* when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks under the equitable catchall provision, § 1132(a)(3). See A.A., ex rel. J.A. v. Blue Cross & Blue Shield of Ill., No. 2:13-cv-00357, 2014 WL 910144, at *11 (W.D. Wash. Mar. 7, 2014) ("Dismissal of a Section [1132](a)(3) claim is appropriate at the summary judgment stage where a plaintiff has asserted, *and obtained relief for*, a claim under Section [1132](a)(1)(B)." (emphasis added)); Jones v. Allen, No. 2:11-cv-380, 2014 WL 1155347, at *9 (S.D. Ohio Mar. 21, 2014) ("It [is] well established in [the Sixth] Circuit that plaintiffs [can] bring claims for breaches of fiduciary duty in ERISA cases, and [can] even do so alongside a claim for benefits in certain circumstances.").

Contrary to Defendants' argument, Varity does not limit the number of ways a party can initially seek relief at the motion to dismiss stage. The case Black v. Long Term Disability Insurance summarizes our views well:

> Varity Corp. does not hold that when an ERISA plaintiff alleges facts supporting both a § 1132(a)(1)(B) and a § 1132(a)(3) claim, a court must or should grant a defendant's Rule 12(b)(6) motion to dismiss the latter claim. Varity Corp. did not deal with pleading but rather with relief. . . .
>
> Further, nothing in Varity Corp. overrules federal pleading rules. And, under such rules, a plaintiff may plead claims hypothetically or alternatively. To dismiss an ERISA plaintiff's § 1132(a)(3) claim as duplicative at the pleading stage of a case would, in effect, require the plaintiff to elect a legal theory and would, therefore, violate [the Federal Rules of Civil Procedure].

373 F. Supp. 2d 897, 902–03 (E.D. Wis. 2005) (internal citations omitted).

Silva presents two alternative—as opposed to duplicative—theories of liability and is allowed to plead both.  See Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."); Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); see also Fed. R. Civ. P. 18 ("A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party.").  The plaintiff is simply not allowed to recover twice.

We find further support for our interpretation of Varity in Amara.  In Amara, the plaintiffs sought relief under § 1132(a)(1)(B).  After discussing § 1132(a)(1)(B) and determining that plaintiffs could not obtain relief under that section of ERISA, the Court turned to § 1132(a)(3) and stated that plaintiffs may be able to obtain equitable relief under that section.  131 S. Ct. at 1878–79.  The Court addressed the issue in terms of available relief and did not say that plaintiffs would be barred from initially bringing a claim under the § 1132(a)(3) catchall provision simply because they had already brought a claim under the more specific portion of the statute, § 1132(a)(1)(B).

We recognize that this interpretation of Varity may seem to be at odds with earlier Eighth Circuit cases.  See, e.g., Pilger, 725 F.3d at 927 ("Plaintiffs' ability to seek this relief in their § 1132(a)(1)(B) claim forecloses them from also pursing it in this § 1132(a)(3)(B) claim."); Antolik, 463 F.3d at 803 (same); Wald v. Sw. Bell Corp. Customcare Med. Plan, 83 F.3d 1002, 1006 (8th Cir. 1996) (same).  These cases, however, are distinguishable based on the stage of litigation the court was reviewing.  All three cases were on appeal from a motion for summary judgment—not a motion to dismiss.  This is important because claims are more developed by the time a motion for summary judgment is filed.  At summary judgment, a court is better equipped to assess the likelihood for duplicate recovery, analyze the overlap between

-25-

claims, and determine whether one claim alone will provide the plaintiff with "adequate relief."

At the motion to dismiss stage, however, it is difficult for a court to discern the intricacies of the plaintiff's claims to determine if the claims are indeed duplicative, rather than alternative, and determine if one or both could provide adequate relief. See Black, 373 F. Supp. 2d at 901–02 ("[A] district court should generally not dismiss a § 1132(a)(3) claim as duplicative of a claim for benefits at the motion to dismiss stage of a case."); Allbaugh v. Cal. Field Ironworkers Pension Trust, No. 2:12-cv-00561, 2014 WL 2112934, at *6 (D. Nev. May 20, 2014) ("[A]t the pleading stage, a plaintiff may advance multiple, alternative, even contradictory theories of liability [under ERISA]."). At the pleading stage, it is difficult to determine if relief is indeed owed under § 1132(a)(1)(B), and requiring the plaintiff to pursue that path may foreclose the plaintiff from bringing a better case pursuant to § 1132(a)(3). For example, the Eastern District of Missouri—the same district where the present case originates—recently declined to dismiss a plaintiff's claims for relief under §§ 1132(a)(1)(B) and (a)(3) on a motion to dismiss because the factual record had not been developed sufficiently for the court to be able to discern if the claims were indeed duplicative. Martin v. Aetna Life Ins. Co., No. 4:13cv1108, 2014 WL 2009079, at *4 (E.D. Mo. May 16, 2014) (noting that the prohibition against duplicative ERISA claims applies "only when § 1132(a)(1) provides an adequate remedy").

At oral argument, Defendants' counsel argued that because Silva has a claim under § 1132(a)(1)(B), albeit, according to Defendants, not a successful one, he is barred from asserting a claim under § 1132(a)(3). Defendants' argument illustrates the unfairness of their position. As stated at length above, we believe Varity only bars duplicate recovery and does not address pleading alternate theories of liability. Under § 1132(a)(1)(B), Silva is arguing that the insurance policy was valid and that Abel's failure to provide evidence of insurability does not alter the validity of the policy. In the alternative, under § 1132(a)(3), Silva is arguing that if Abel's policy

-26-

was never validly approved and therefore did not go into effect due to the missing Statement of Health form, MetLife and Savvis are still liable to him due to fiduciary misconduct. These arguments assert different theories of liability.[12] Because these claims are based on alternative legal bases for relief, Silva may plead both. If on remand, the district court finds Defendants liable under Silva's § 1132(a)(1)(B) claim, then the court need not reach his claim under the equitable catchall provision, § 1132(a)(3), as the former subsection has already provided Silva with "adequate relief." See Varity, 516 U.S. at 515. But at the motion to dismiss stage of litigation,

_____

[12]Under § 1132(a)(1)(B), the remedy Silva seeks is payment of the $429,000 life insurance policy. The remedy under § 1132(a)(3) is less clear, but at oral argument, Silva's counsel and counsel for the Department of Labor argued that the remedy should be the same: make-whole relief, taking the form of the full payment of benefits under the policy. See Amara, 131 S. Ct. At 1880 ("[T]he fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief."). The fact that the remedy sought is the same amount of money in this case does not affect our analysis because the arguments Silva makes to reach that remedy remain alternate, equitable theories of liability. See Echague v. Met. Life Ins. Co., No. 12-CV-00640, 2014 WL 2089331, at *11 (N.D. Cal. May 19, 2014) ("The mere fact that the amount that plaintiff seeks under her (a)(3) claim is similar to the amount plaintiff seeks under her (a)(1)(B) claim does not automatically preclude her (a)(3) claim."). Indeed, in the context of a life insurance policy, the remedy sought under § 1132(a)(3) generally always be the full benefits available under the policy. Therefore, similarity in the form of the remedy sought does not alter our view that Silva should have the opportunity to plead and argue both claims. See Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1073–74 (11th Cir. 2004) (concluding that similarity of the relief sought does not determine whether both § 1132(a)(1)(B) and (a)(3) claims can proceed). In addition, prior to this suit, MetLife internal correspondence shows that the company thought Silva may be entitled to three times his salary, $257,100, rather than the entire value of the life insurance policy. Although Silva is asking for full relief, it is not clear that the relief under §§ 1132(a)(1)(B) and (a)(3) is necessarily the same.

we simply hold that on remand that Silva is allowed to assert liability under the two subsections of 29 U.S.C. § 1132 at issue in this case.[13]

IV.    Conclusion

We reverse the district court's grant of summary judgment to Defendants on Silva's § 1132(a)(1)(B) claim and the district court's denial of Silva's motion to amend to add a claim under § 1132(a)(3). We remand to the district court so Silva has a full opportunity to litigate both of his ERISA claims in light of our decision.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I join the opinion of the court with respect to its disposition of Silva's motion to amend his complaint to add a claim under 29 U.S.C. § 1132(a)(3). However, because I believe that the district court properly granted summary judgment in favor of MetLife and Savvis on Silva's claim under 29 U.S.C. § 1132(a)(1)(B), I respectfully dissent from Part III.A of the opinion of the court.

In considering a § 1132(a)(1)(B) claim, we review a plan administrator's benefits determination for abuse of discretion when, as here, the "plan grants the administrator discretion to determine eligibility for benefits and to interpret the plan's terms." *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011). Under this standard, a plan "administrator's decision should be affirmed if it is reasonable." *Id.* (internal citations and quotations omitted). As the court observes, the ERISA plan in this case provides that Abel's supplemental-life-insurance coverage would not commence if he did not give MetLife "evidence of insurability or the evidence of insurability is not accepted by [MetLife] as satisfactory." *See ante* at 4. MetLife interpreted this provision to require Abel to submit a Statement of Health, which he

_____

[13]We leave for another day the issue of whether future cases may require the plaintiff to elect which theory it is going to pursue at trial once full discovery has been conducted.

-28-

did not do. The dispositive question in this case, then, is whether MetLife's interpretation was reasonable. *See ante* at 11.

> In reviewing [a plan administrator's] interpretation of its plan language, we generally examine the following factors [often known as the *Finley* factors]: (1) whether the interpretation is consistent with the goals of the plan; (2) whether it renders any language in the plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of ERISA; (4) whether [the plan administrator] has interpreted the provisions at issue here consistently; and (5) whether the interpretation is contrary to the clear language of the plan.

*McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012) (*citing Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992)).[14] "[W]e do not search for the best or preferable interpretation of a plan term." *Hutchins v. Champion Intern. Corp.*, 110 F.3d 1341, 1344 (8th Cir. 1997). "[W]e may not find the interpretation invalid merely because we disagree with it, but only if it is unreasonable." *Id.*

Consideration of the *Finley* factors shows that MetLife reasonably interpreted the plan to require submission of a Statement of Health. First, MetLife's interpretation is consistent with the clear language of the plan. The plan requires participants to submit evidence of insurability that is "satisfactory" to MetLife. This

---

[14]Although we also must consider MetLife's inherent conflict of interest as both insurer and plan administrator, that conflict will be most relevant "'as a tiebreaker' when the issue is close" or "'where circumstances suggest a higher likelihood that it affected the benefits decision.'" *Jones v. ReliaStar Life Ins. Co.*, 615 F.3d 941, 946 (8th Cir. 2010) (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). I do not find this case so close as to require a tiebreaker, and Silva has not pointed to any evidence that MetLife's conflict of interest was particularly likely to affect this specific benefits decision.

phrasing necessarily contemplates that MetLife would require some evidence—such as a Statement of Health—that is not specified by the plan's terms and that MetLife would be the judge of the adequacy of that evidence. Silva has not provided any reason to doubt that requiring the submission of a Statement of Health is a fair method of assessing the health of a life-insurance applicant. Second, the record demonstrates that MetLife has applied its interpretation consistently. As the court observes, approximately 200 other Savvis employees were found not to have completed a Statement of Health. *See ante* at 6-7. MetLife applied the same plan interpretation to these employees as it did to Silva and required them to submit Statements of Health. *See* Appellant's Appendix at 565 (containing MetLife internal claims-determination file) ("[W]e have determined that we will not be grandfathering these individuals into the plan at the amounts they've requested. We will require ALL past participants to submit a form."). This consistent application supports the reasonableness of MetLife's interpretation. Third, requiring submission of a Statement of Health also comports with at least one plan goal, that is, ensuring affordability for participants. As the court notes, the evidence-of-insurability provision can prevent "those who may be very ill from taking out a large life insurance policy shortly before death." *Ante* at 11. By limiting MetLife's risk exposure, such a requirement could in turn reduce premium costs for other participants. Refusing to enforce this provision in the reasonable manner selected by MetLife could impose future premium increases on other plan participants. Finally, none of the other *Finley* factors undermines MetLife's interpretation. In light of these factors, which the court does not specifically analyze, I conclude that MetLife reasonably interpreted the plan to require submission of a Statement of Health, a requirement with which Abel did not comply.

The court objects that the administrative record omits certain facts that the court deems necessary to determining whether MetLife abused its discretion. But I am not convinced that these evidentiary lacunae are so glaring. In particular, the administrative record shows that MetLife investigated Savvis's method of notifying employees that submitting a Statement of Health is required. And Savvis responded

that when employees attempt to enroll for benefits through its online enrollment system, the system prompted them to complete a Statement of Health and directed them to the company's benefits department, from which the form could be obtained. *See* Appellant's Appendix 573-76. Silva did not present evidence to contradict the results of MetLife's investigation. Thus, the uncontradicted evidence in the administrative record supports the conclusion that Abel received notice that he was required to complete a Statement of Health. *See Green*, 646 F.3d at 1050 (explaining that a plan administrator's benefits determination is reasonable if "it is supported by substantial evidence"). As such, I believe that the district court correctly granted summary judgment in favor of MetLife and Savvis on Silva's § 1132(a)(1)(B) claim.

As noted above, I agree with the court that Silva was permitted to plead simultaneously claims under both § 1132(a)(1)(B) and § 1132(a)(3). The court correctly explains that at this early stage of litigation, an ERISA plaintiff may plead claims under both provisions in the alternative. *See ante* at 23-28. Critically, though, a § 1132(a)(3) claim—even if pled in the alternative—cannot survive a motion to dismiss if the plaintiff seeks to enforce rights that arise under the terms of an ERISA plan; § 1132(a)(1)(B) provides the exclusive remedy for vindicating rights arising under the terms of the plan. *See Pilger v. Sweeney*, 725 F.3d 922, 927 (8th Cir. 2013). Here, however, Silva premises his § 1132(a)(3) claim on alleged breaches of the defendants' fiduciary duties that prevented him from becoming eligible for benefits under the plan. *See Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448 (5th Cir. 2013); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176 (4th Cir. 2012). Accordingly, I join the court's disposition of Silva's motion to amend his complaint to add a claim under § 1132(a)(3).

_____